**SUMMIT MEDICAL CENTER OF ALABAMA, INC., New Women's Health Care; Center for Choice; Beacon Women's Center; West Alabama Women's Center; Reproductive Health Services; Louis T. Payne, M.D.; and Richard Stuntz, M.D., on behalf of themselves and their patients seeking abortions, Plaintiffs,**

v.

**Don SIEGELMAN, in his official capacity as Governor for the State of Alabama and his agents and successors; Bill Pryor, in his official capacity as Attorney General for the State of Alabama and his agents and successors;**

---

Donald Williamson, M.D., in his official capacity as State Health Officer for the Alabama Department of Public Health and his agents and successors; and Ellen Brooks, in her official capacity as Montgomery District Attorney and as representatives of the class of district attorneys for the State of Alabama, Defendants.

No. CIV.A. 02–A–1064–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 30, 2002.

Order Amending Preliminary Injunction,
Oct. 14, 2002.

M. Wayne Sabel, Sabel & Sabel, P.C., Montgomery, AL, David A. Gespass, Gespaaa & Johnson, Birmingham, AL, Linda A. Rosenthal, New York City, for plaintiffs.

William H. Pryor, Jr., Charles B. Campbell, Office of Atty. Gen., Montgomery, AL, Edward A. Hosp, Office of Governor, Montgomery, AL,for defendants.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case is before the court on a Motion for Temporary Restraining Order/Preliminary Injunction filed by the Plaintiffs on September 17, 2002.

The Plaintiffs, a group of health care facilities and physicians who provide abortion services in the State of Alabama, challenge the constitutionality of The Woman's Right to Know Act[1] and seek either a preliminary injunction or a temporary restraining order against its enforcement. The Defendants include the Governor of the State of Alabama, the Attorney General, the State Health Officer, and a class of prosecuting attorneys. The court held a hearing on the matter on September 26–27, 2002 during which both sides presented comprehensive evidence of their respective positions.

For the reasons to be discussed, the Motion for Temporary Restraining Order is due to be DENIED; the Motion for Preliminary Injunction is due to be GRANTED in part and DENIED in part.

### II. STANDARD OF REVIEW

A district court may grant preliminary injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irrepa-

---

1. A copy of the challenged Act is attached as Appendix A to this Memorandum Opinion.

rable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest *McDonald's Corp. v. Robertson* 147 F.3d 1301, 1306 (11th Cir.1998). The purpose of a preliminary injunction is to protect the moving party from irreparable injury and to preserve the status quo until the district court renders a meaningful decision on the merits. *Carr v. State of Ala. Human Resources*, 952 F.Supp. 1496, 1500 (M.D.Ala.1996).

■ The Eleventh Circuit has consistently stated that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion" as to the four requisites. *Id.* at 1306–07 (internal quotations omitted). Particularly relevant to the present case is the Eleventh Circuit's statement that "preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts". *Northeastern Florida Chapter of Ass'n of General Contractors of America v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir.1990), *rev'd on other grounds*, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

### III. *THE WOMAN'S RIGHT TO KNOW ACT*

The State of Alabama adopted The Woman's Right to Know Act ("Act No. 2002–419" or "the Act") on April 17, 2002.

The Act will go into effect on October 14, 2002. Act § 15. Its purpose is "to ensure that every woman considering an abortion receives complete information on the procedure, risks, and her alternatives." Act § 2(b). In similarity to statutes passed by an increasing number of states, the Act is an "informed consent" statute by which providers of abortions are required to provide a patient seeking an abortion with certain information and a designated set of printed informational materials at least twenty-four hours prior to an abortion procedure, either in person or by certified mail, and to then obtain her informed consent before the abortion is performed. Act § 4(a), (b).

The Act mandates that the Department of Public Health ("DPH") has 180 days from the Act's effective date to publish the following printed materials for distribution:

(1) Geographically indexed printed materials designed to inform the woman of public and private agencies and services available to provide medical and financial assistance to a woman through pregnancy, prenatal care, upon childbirth, and while her child is dependent. The materials shall include a comprehensive list of the agencies, a description of the services offered, and the telephone numbers and addresses of the agencies.

(2) The printed materials shall include a list of adoption agencies geographically indexed and that the law permits adoptive parents to pay the cost of prenatal care, childbirth and neonatal care.

(3) Printed materials that inform the pregnant woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term. It shall include color photographs of the developing child at each of the two-week gestational increments, a

clear description of the unborn child's development, any relevant information on the possibility of the unborn child's survival, and dimensions of the unborn child. The materials shall be realistic, clear, objective, non-judgmental, and designed to convey only accurate scientific information about the unborn child at the various gestational ages.

(4) The materials shall contain objective information describing the methods of abortion procedures commonly employed and the medical risks of each, and the medical risks associated with carrying a child to term.

(5) The printed materials shall list the support obligations of the father of a child who is born alive.

(6) The printed materials shall state that it is unlawful for any individual to coerce a woman to undergo an abortion, that any physician who performs an abortion upon a woman without her informed consent may be liable to her for damages in a civil action at law.

(7) The material shall include the following statement: "There are many public and private agencies willing and able to help you to carry your child to term, and to assist you and your child after your child is born, whether you choose to keep your child or place him or her for adoption. The State of Alabama strongly urges you to contact those agencies before making a final decision about abortion. The law requires that your physician or his or her agent give you the opportunity to call agencies like these before you undergo an abortion."

Act § 5(a). These materials "shall be in a bound booklet, shall contain large clear photographs, and shall be printed in a typeface large enough to be clearly legi-

ble". Act § 5(b). DPH must also create a video tape detailing much of the information in the printed materials as well as a consent form in order for the patient to verify that she gives informed consent pursuant to the Act. Act § (6)(a), (c).[2]

In addition, the Act requires a physician or qualified person to inform the woman in person of additional information prior to the abortion. Act § 4(b). Among other things, this section of the Act requires the woman to be informed of the following, which is challenged by the Plaintiffs:

(3) The probable gestational age of the unborn child at the time the abortion is to be performed, and the probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed. If the unborn child is viable or has reached a gestational age of more than 19 weeks, that:

a. The unborn child may be able to survive outside the womb.

b. The woman has the right to request the physician to use the method of abortion that is most likely to preserve the life of the unborn child, provided such abortion is not otherwise prohibited by law.

c. If the unborn child is born alive, the attending physician has the legal obligation to take all reasonable steps necessary to maintain the life and health of the child.

Act § (4)(b)(3).

The Act also contains a provision that excuses the physician or qualified person from compliance with the Act's informed consent provisions in the event of a "medical emergency." Act § 4. The Act defines a "medical emergency" as:

---

**2.** Unlike the mandatory printed materials, the video tape need only be made available to those who want to see it. Act § 4(b)(5), 4(d).

That condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or in which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

Act § 3(5). If the physician believes a woman faces a "medical emergency," he or she must document the medical conditions associated with the medical emergency abortion on a DPS form. Act § 8(b).

The Act contains a severability clause in the event "one or more provision, section, subsection, sentence, clause, phrase, or word of this chapter or the application thereof to any person or circumstance is found to be invalid or unconstitutional, the same is hereby declared to be severable and the balance of this chapter shall remain effective." Act § 14. Finally, the Act enumerates both criminal penalties and civil liability for violation of its terms. Act §§ 9, 10.

### IV. *DISCUSSION*

In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court recognized a woman's constitutionally protected privacy interest under the Due Process Clause of the Fourteenth Amendment in deciding whether to terminate a pregnancy. *Id.* at 153, 93 S.Ct. 705. At the same time, the Court acknowledged that the state's interest in potential life and the health of the mother necessitated state regulation in certain circumstances. *See id.* at 163–64, 93 S.Ct. 705. In order to determine when such regulations would be constitutional, *Roe* initially established a trimester framework, however, the Court modified this analytical approach in *Planned Parenthood of Southeastern*

*Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). *Casey* held that the right of a woman to decide for herself whether to terminate a pregnancy must be protected from "undue burdens" imposed by state regulation. *Id.* at 876, 112 S.Ct. 2791. More specifically, state regulation must not have "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. 2791. Subsequent to viability, however, the state may either regulate or proscribe abortion except when necessary to preserve the life or health of the mother. *Id.* at 879, 112 S.Ct. 2791. According to the Court:

> What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the State...may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose. Unless it has that effect on her right of choice, a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal. Regulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden.

*Id.* at 877–78, 112 S.Ct. 2791 (citations omitted).

Since the *Casey* decision, several states have enacted informed consent statutes modeled from the portions of the Pennsylvania statute upheld by the Court in *Casey.* The State of Alabama is the most recent entry to this list, as The Woman's Right to Know Act is based largely upon

the *Casey* statute.[3] Although the Eleventh Circuit has yet to have the opportunity to apply the *Casey* framework to an informed consent statute, the court takes notice of the few cases from other jurisdictions that have and finds their application of *Casey* instructive. *See, e.g., A Woman's Choice–East Side Women's Clinic v. Newman,* 305 F.3d 684, 2002 WL 31050945 (7th Cir.2002) (upholding Indiana's informed consent statute); *Karlin v. Foust,* 188 F.3d 446 (7th Cir.1999) (upholding Wisconsin's informed consent statute); *Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452 (8th Cir.1995) (upholding South Dakota's mandatory information provision of its informed consent law); *Fargo Women's Health Organization v. Schafer,* 18 F.3d 526 (8th Cir.1994) (upholding North Dakota's informed consent statute); *Barnes v. Moore,* 970 F.2d 12 (5th Cir.1992) (upholding the constitutionality of Mississippi's pre-*Casey* informed consent statute); *Eubanks v. Schmidt,* 126 F.Supp.2d 451 (W.D.Ky.2000) (upholding Kentucky's informed consent statute).

The Plaintiffs have submitted several reasons that they urge should require the court to enjoin the Act from taking effect on October 14, 2002 and to maintain the current state of the law pending a final hearing at a later date on their challenge to the constitutionality of the Act. These arguments will now be discussed separately.

### A. Medical Emergency Exception

■ The Plaintiffs argue that the Act's definition of a "medical emergency" is unconstitutionally narrow, because it does not include an exception from the informed consent requirements for cases where complying with them would result in severe harm to the woman's psychological or mental health.[4]

Since *Roe v. Wade,* the Supreme Court has been clear that states may not regulate abortions in ways that cause harm to women's health. *Id.* at 163–65, 93 S.Ct. 705; *Casey,* 505 U.S. at 880, 112 S.Ct. 2791 ("[T]he essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health."). Although the Supreme Court has never held that an informed consent statute must have an explicit exception for mental health, this court concludes that the Act's definition of "medical emergency" is broad enough to include both mental and psychological health within its parameters.[5] This conclusion is needed for two reasons.

First, the Act contains a prefatory findings section in which the Legislature states the following: "It is essential to the *psychological* and physical well-being of a woman considering an abortion that she receive complete and accurate information on her alternatives." Act § 2(a)(1) (emphasis added). The purpose of the Act is based on the findings in § 2(a). Act

---

3. Under Alabama law, the Legislature is presumed to have been aware of the Supreme Court's construction of the Pennsylvania statute in *Casey* and is presumed to have adopted it. *See Water Works, Gas & Sewer Bd. v. P.A. Buchanan Contracting Co.,* 294 Ala. 402, 318 So.2d 267, 269 (1975).

4. In this respect, the Act differs from the Pennsylvania statute upheld in *Casey* in that it lacks an express exception from the informed

consent requirements in the event providing certain material would have a severe adverse effect on the woman's mental health. *See Casey,* 505 U.S. at 879–80, 112 S.Ct. 2791.

5. When a federal court is confronted with an question of state statutory construction, the court must try to predict from existing state law how the state courts would interpret the same provision. *Cotton States Mut. Ins. Co. v. Anderson,* 749 F.2d 663, 667 (11th Cir.1984).

§ 2(b). In order to give proper effect to this express legislative intent, the emergency medical exception must be read to include both the physical and psychological health of the patient. *See Archer Daniels Midland Co. v. Seven Up Bottling Co.,* 746 So.2d 966 (Ala.1999) ("[W]e must follow the cardinal rule of statutory construction and ascertain and give effect to the intent of the Legislature in enacting the statute."). Indeed, this court would be undercutting the will of the Legislature were it to hold that a physician must provide a woman with information that would create a psychological or mental medical condition rising to the level of a medical emergency. *See Karlin,* 188 F.3d at 490.

Second, the court believes that the actual text of the medical emergency exception is broad enough to capture both mental and psychological threats to a woman's well-being. As stated previously, a medical emergency is a "condition...in which a delay will create serious risk of substantial and irreversible impairment of a major bodily function." Act § 3(5). After a close reading of the text, nothing in the language suggests that the emergency provision is intended to arise only from a physical "condition." In fact, to interpret this provision as excluding mental health conditions would place this court squarely at odds with the Supreme Court's recognition that "psychological well-being is a facet of health" in the abortion context. *Casey,* 505 U.S. at 882, 112 S.Ct. 2791.

Given these considerations, the court concludes that the term "medical emergency" as used in the Act must include the following understanding as expressed by the Seventh Circuit in interpreting the similar Wisconsin informed consent statute:

> [W]hen a reasonable physician would determine that some specific information required to be given under [the Act's]

informed consent provisions would cause a woman psychological harm sufficient to rise to the level of a medical emergency, the physician may forgo providing this specific information to the woman. This conclusion does not, however, exempt the physician from otherwise complying with [the Act's] informed consent requirements or the twenty-four hour waiting period. The physician still must provide the woman with all other required information that does not create a significant, non-temporary threat of severe harm to the woman's mental health, even if this information makes the woman extremely uncomfortable or creates a substantial degree of anxiety. *Karlin,* 188 F.3d at 490.

■ The Plaintiffs have argued that this medical emergency exception is not constitutionally sufficient if it allows for application of the Act at all in cases of women whose pregnancies are the result of rape or incest. While some state informed consent statutes have included additional limited exceptions outside of medical emergencies, Alabama's and other states' do not. *Compare, e.g.,* 18 *Pa. Cons.Stat.* § 3205(a)(2)(iii) (stating that in the case of a pregnancy by rape or incest, information regarding the father's support obligations need not be given to the woman), *and Ind.Code* § 16–34–2–1.1(2)(B) (same), *with S.D. Codified Laws* § 34–23A–10.1 (containing no such exception for rape or incest), *and Miss.Code Ann.* § 41–41–33(1)(b)(ii) (containing no such provision). All Circuits which have considered the issue have declined to find such an exception to be necessary to the constitutionality of the statutes considered. *Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1467 (8th Cir.1995) (refusing to overrule Circuit precedent that a specific rape and incest exception was not constitutionally required); *Fargo Women's Health Or-*

*ganization v. Schafer*, 18 F.3d 526, 533 (8th Cir.1994) (holding that a North Dakota statute lacking an express exception for rape and incest victims passed constitutional scrutiny); *Barnes v. Moore*, 970 F.2d 12, 14–15 (5th Cir.1992) (upholding the constitutionality of Mississippi's informed consent statute even though it lacked an express exception for rape and incest victims).

This court finds the *Karlin* decision to be well-reasoned and persuasive in this regard. Women carrying unborn children that are the product of rape or incest will be exempt from the Act if they meet the *Karlin* standard. *Karlin* expressly rejected the piecemeal approach taken by the district court in deciding under what circumstances a physician could deviate from Wisconsin's informed consent law in the event providing a woman with information would cause her severe psychological harm. *Karlin*, 188 F.3d at 490. Rather than basing the test on specific factual scenarios such as whether the woman was a victim or rape or incest, the Seventh Circuit enunciated a single test for all instances in which providing a woman with informed consent materials may cause mental or psychological harm rising to the level of a medical emergency. This court is in accord with the Seventh Circuit and adopts its test in full. Therefore, with the exception of the two specific situations discussed in the next section, a physician must comply with the *Karlin* standard in order to excuse a woman from the Act's informed consent provisions for psychological or mental health reasons. In all as-

pects of the medical emergency exception of the Act, of course, the Legislature has recognized that the physician must exercise his or her "good faith professional judgment." Act § 3(5).

## B. Application of the Act to Ectopic Pregnancies and Unborn Children with Lethal Anomalies

After hearing the presentation of evidence, the court has reservations about the constitutionality of applying the Act's informed consent provisions to women in two situations: 1) women diagnosed as carrying a fetus with a lethal anomaly,[6] and 2) women with ectopic pregnancies.[7] In *Casey*, the Supreme Court stated that informed consent statutes further the dual state interests of protecting maternal health and fetal life. *Casey*, 505 U.S. at 846, 112 S.Ct. 2791. As the court understands the evidence, women with ectopic pregnancies and women carrying unborn children with lethal fetal anomalies have no chance of successfully bringing a living child to term. Therefore, regardless of the degree of impact on the woman's psychological health, requiring physicians to provide these women with the information called for in the Act serves neither of the state interests recognized in *Casey*. In these two circumstances, the court fails "to see how the provision of this largely irrelevant information helps a woman to facilitate the wise exercise of her abortion right."[8] *Karlin*, 188 F.3d at 489 n. 16. Accordingly, the court will preliminarily enjoin the application of the Act to women diagnosed with ectopic pregnancies and

---

**6.** The court understands the term lethal fatal anomaly to mean that the child would die at birth or be stillborn.

**7.** An ectopic pregnancy occurs when the fertilized egg begins to develop in a location other than the womb. These pregnancies can never result in the birth of a living child.

**8.** The court will assume for purposes of this motion that termination of an ectopic pregnancy or a fetus with a fatal anomaly falls within the definition of an "abortion" under the Act. Act § 3(1).

women carrying unborn children with lethal fetal anomalies.

## C. *Gestational Age Statement*

■ Under the Act, "if the unborn child is viable or has reached a gestational age of more than 19 weeks," the physician or qualified person must inform the patient that "the unborn child may be able to survive outside the womb." Act § (4)(b)(3)(a). The Plaintiffs argue that this statement is medically untrue and therefore unconstitutional under *Casey*. On the other hand, the Defendants argue that this provision is truthful because it only requires the physician to inform the woman that an unborn child at more than 19 weeks gestation *may survive* outside the woman. In short, the Defendants contend that this statement is both medically accurate and consistent with their understanding of the word "survive."

In addressing the constitutionality of informed consent statutes, the Supreme Court has permitted states to provide information to abortion patients as long as the information is "truthful and not misleading." *Casey*, 505 U.S. 833, 882, 112 S.Ct. 2791 (1992). The Court held that this information could include the nature of the procedure, the attendant health risks of abortion and those of childbirth, the probable gestational age of the fetus, and the consequences to the fetus. *Id.* at 882. Nevertheless, the Court emphasized that this information could not be "designed to dissuade the woman from having an abortion." *Id.*

■ Given this standard, the issue before the court is whether it is truthful and not misleading to inform a woman that a nonviable unborn child at more than 19 weeks gestation "may be able to survive" outside the womb. The evidence in the record conflicts as to the answer of this question, centering on interpretation of the word "survive."[9] The parties presented several experts in the area of fetal development and the most that can be concluded is that the definition of the term survive varies among practitioners and medical situations. Therefore, in order to construe the Act as in compliance with *Casey*'s truthful or not misleading standard,[10] the court holds that physicians and qualified persons must go beyond a simple mechanical reading of this provision and provide the woman with the following information: 1) a full and complete definition of the term "survive" in accordance with the physician's good faith clinical judgment; 2) the nature of any survival; 3) survival is merely a possibility; 4) survival will or may be of extremely limited duration.

In reaching this conclusion, the court emphasizes that the Alabama Legislature found it "desirable and imperative" that the decision to have an abortion be made with "full knowledge of its nature and consequences." Act § 2(a)(3). Indeed, a woman lacking this information "may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." *Casey*, 505 U.S. at 882, 112 S.Ct. 2791. Accordingly, in order for the gestational age survival statement to comply with both *Casey* and the intent of the Legislature,

---

**9.** The evidence in the record suggests multiple definitions of the word "survival," ranging from living to 120 days after birth to simply surviving for a few minutes.

**10.** Under Alabama law, the courts uniformly approach interpretation of a statute with ev-

ery presumption and intendment in favor of its validity, and attempt to uphold the law rather than strike it down. *Ala. State Fed. of Labor v. McAdory*, 246 Ala. 1, 18 So.2d 810, 815 (1944).

this court holds that physicians or qualified persons must go beyond the mere words of the Act and inform their patients about the meaning of the term survival as well as the nature and extent of any possible survival. Nothing in the Act prohibits this, and, just as a woman has a right to know that there may be even momentary "survival," she has a right to be fully informed of the nature of such survival.

### D. *Choice of Method Provision*

■ Prior to the abortion procedure, if the unborn child is viable or has reached a gestational age of more than 19 weeks, a physician or other qualified person must inform the woman in person that she has "the right to request the physician to use the method of abortion that is most likely to preserve the life of the unborn child, provided such abortion is not otherwise prohibited by law." Act § 4(b)(3)(b). The Plaintiffs argue that this provision is unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause. The Plaintiffs contend that this provision could be interpreted as granting a woman an enforceable right to direct a physician to perform the abortion according to her choice of method. Under this reading, the Plaintiffs argue that the Act places physicians in an untenable position of either having to comply with the Act against their best medical judgment or decline to perform the abortion and risk criminal penalties. On the other hand, the Defendants argue that this section should be read as simply informing the woman of a right she already has, i.e., to make a request, and that the physician is by no means required to agree to the request.

The Court rejects the Plaintiffs construction of the choice of method provision and finds it neither unconstitutional nor meaningless. The plain text of the statute says that the woman has *"the right to request"* a particular method of abortion. This provision simply informs the woman of her right to ask for a particular medical procedure, a valuable right that may be unfamiliar to some women and critical to their decision-making process. Indeed, it would be a distortion of the plain text to hold that the "right to request" language somehow creates an enforceable right to demand that a physician perform an abortion according to a woman's wishes. In the event that the woman should exercise her right to make such a request, the physician is free to decline the request. Alternatively, the woman is free to consent to the physician's preferred method or withhold her consent altogether and visit another physician. This interpretation is consistent with both the plain text of the Act and the Legislature's goal of providing women with full knowledge surrounding the nature and consequences of the abortion procedure. Act § 2(a)(3). Because the court finds that the Plaintiffs have not shown a likelihood of success on the merits of their claim that the choice of method provision is unconstitutionally vague, a preliminary injunction will not be issued against this provision of the Act.

### E. *Distribution of Informational Materials*

The Act requires the Department of Public Health to create a printed informational booklet as well as an informational video tape.[11] Although the Act is scheduled to take effect on October 14, 2002, DPS is not required to produce these materials until April 12, 2003, 180 days after the effective date of the Act. Act § 5(a). The logical inference from this time gap is that

---

11. The booklet must include all of the information listed in § 5(a) of the Act. The video tape must comply with § 6(a).

the Legislature did not deem the production of these informational materials as a necessary requisite for the Act to take effect. Put another way, the Legislature seemingly understood that the other portions of the Act would take effect on October 14 even though the section regarding the distribution of informational materials may not be in force until DPS completed the booklet and video tape within 180 days thereafter. In fact, the comprehensive severance clause contained in § 14 of the Act substantiates the inference that one section may operate without the other because the Legislature expressly states that the remainder of the Act shall stay in effect in the event one provision is held invalid or unconstitutional. Act § 14. With the backdrop that the Legislature did not intend for the distribution of the booklet and videotape to be a necessary ingredient for the Act to take effect, the court will now address the Plaintiffs' argument that much of the information within these materials violates *Casey*'s "truthful and not misleading" standard.

The Defendants produced final copies of the booklet and video tape for the first time at the hearing on September 26–27, 2002. In fact, the Defendants represented that these materials are now ready for immediate distribution such that they will be available to all abortion providers by the time the Act takes effect on October 14. Nevertheless, during the course of the two-day hearing, both parties presented the court with conflicting information as to truthfulness of some of the State's informational materials, and as to whether some statements made in the materials, while literally true, might be misleading to a woman seeking an abortion.

After presentation of all the evidence, the court was left with several concerns. First, portions of the materials do not appear to comply with the strict letter of the Act. Second, credible experts presented conflicting testimony as to the truthfulness and accuracy of factual data within the materials. Third, given the Legislature's directive to provide "only accurate scientific information" and its implicit recognition that these materials are not essential for the Act to take effect, but may be developed within a period of approximately six months thereafter. the court is reluctant to require the release of information that may not comply with *Casey*. Indeed, these concerns are bolstered by the magnitude of the decision to have an abortion as well as the potential persuasiveness that state approved materials may have in this context. For all these reasons, the court will preliminarily enjoin distribution of both the DPS booklets and the video tape, pending further consideration. The court finds no reason, however, to delay the requirement of furnishing the information called for in section (a) of the Act at least 24 hours before an abortion, in such form as the physician deems appropriate in the good faith exercise of professional judgment.

### F. Security

Federal Rule of Civil Procedure 65(c) requires that "[n]o...preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

While the evidence presented by the Defendants showed that substantial sums of money have already been expended in preparation and having published the materials and video tape, those costs will not have been wasted if the Defendants are ultimately successful on that issue. Additional costs will be incurred only if the court later makes final an injunction

against some of the materials. Therefore, the court determines that security in the sum of $10,000 will be proper.

## V. CONCLUSION

For the reasons stated above, the court has determined that Act No. 2002–419, The Woman's Right to Know Act, should not be enjoined from taking effect on October 14, 2002, except for the limited exceptions discussed. Physicians must inform their patients of the various matters referred to in the Act at least twenty-four hours before performance of an abortion, except in cases of medical emergency. Distribution of state-prepared materials, however, shall be delayed until thorough consideration may be given as to whether they contain any information which is unconstitutionally untrue or misleading.

Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction is due to be GRANTED in part and DENIED in part. A separate Order will be entered in accordance with this Memorandum Opinion.

## APPENDIX A

By Senators Poole, Lipscomb, Butler, Bedford, Lee, Callahan, French, Preuitt, Dixon, Means, Smith, Roberts, Denton, Waggoner, Armistead, Mitchell, Dial, Biddle, Little (T), Holley, and Little (Z)

RFD: Governmental Affairs

First Read: 24–JAN–2002

*Enrolled,* An Act,

To establish the Woman's Right to Know Act; prohibiting the performance or inducement of an abortion without voluntary and informed consent and specifying what constitutes such consent; to require certain documents proving that a minor is emancipated to be certified by the appropriate issuing authority; to prohibit a parent, legal guardian, custodian, or any other person from coercing a minor to have an abortion performed; to provide that the Department of Public Health develop appropriate forms for the consent and emancipation; to require the Department of Public Health to publish certain materials regarding abortions and alternatives; to provide for emergency situations; to require that only a physician may perform abortions; to prescribe criminal penalties and for license suspension of abortion centers; to provide for certain civil actions including professional disciplinary actions and license suspension; to provide for the right of intervention; to provide for a specific construction and a delayed effective date; and in connection therewith would have as its purpose or effect the requirement of a new or increased expenditure of local funds within the meaning of Amendment 621 of the Constitution of Alabama of 1901.

BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

Section 1. This bill shall be known and cited as "The Woman's Right to Know Act."

Section 2. (a) The Legislature of the State of Alabama finds that:

(1) It is essential to the psychological and physical well-being of a woman considering an abortion that she receive complete and accurate information on her alternatives.

(2) Most abortions are performed in clinics devoted solely to providing abortions and family planning services. Most women who seek abortions at these facilities do not have any relationship with the physician who performs the abortion, before or after the procedure. Most women do not return to the facility for post-surgical care. In most instances, the woman's only actual contact with the physician occurs simultaneously with the abortion pro-

cedure, with little opportunity to receive counseling concerning her decision.

(3) The decision to abort is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences. The medical, emotional, and psychological consequences of an abortion are serious and can be lasting or life threatening.

(b) Based on the findings in subsection (a), it is the purpose of this act to ensure that every woman considering an abortion receives complete information on the procedure, risks, and her alternatives. Ensure that every woman who submits to an abortion procedure does so only after giving her voluntary and informed consent to the abortion procedure.

Section 3. For the purposes of this act, the following terms have the following meanings:

(1) ABORTION. The use or prescription of any instrument, medicine, drug, or any other substance or device with the intent to terminate the pregnancy of a woman known to be pregnant. Such use or prescription is not an abortion if done with the intent to save the life or preserve the health of an unborn child, remove a dead unborn child, or to deliver an unborn child prematurely in order to preserve the health of both the mother (pregnant woman) and her unborn child.

(2) CONCEPTION. The fusion of a human spermatozoon with a human ovum.

(3) EMANCIPATED MINOR. Any minor who is or has been married or has by court order otherwise been legally freed from the care, custody, and control of her parents.

(4) GESTATIONAL AGE. The time that has elapsed since the first day of the woman's last menstrual period.

(5) MEDICAL EMERGENCY. That condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or in which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(6) MINOR. Any person under the age of 18 years.

(7) PHYSICIAN. Any person licensed to practice medicine in this state. The term includes medical doctors and doctors of osteopathy.

(8) PREGNANT or PREGNANCY. The female reproductive condition of having an unborn child in the mother's (woman's) body.

(9) QUALIFIED PERSON. An agent of the physician who is a psychologist, licensed social worker, licensed professional counselor, registered nurse, or physician.

(10) UNBORN CHILD. The offspring of any human person from conception until birth.

(11) VIABLE. That stage of fetal development when the life of the unborn child may be continued indefinitely outside the womb by natural or artificial life-supportive systems.

(12) WOMAN. Any female person.

Section 4. Except in the case of a medical emergency, no abortion shall be performed or induced without the voluntary and informed consent of the woman upon whom the abortion is to be performed or induced. Except in the case of a medical

emergency, consent to an abortion is voluntary and informed if and only if:

(a) At least 24 hours before the abortion, the physician who is to perform the abortion, the referring physician, or a qualified person has informed and provided the woman in person, or by return receipt certified mail restricted delivery, and if by mail, again in person prior to the abortion, a copy of the printed materials in Section 5 which list agencies that offer assistance, adoption agencies, development of the unborn child, methods and risks of abortion and childbirth, father's obligations, and alternatives to abortion. Mailing of the materials in Section 5 may be arranged by telephone.

(b) Prior to an abortion, the physician who is to perform the abortion, the referring physician, or a qualified person has informed the woman in person:

(1) The name of the physician who will perform the abortion in writing or a business card.

(2) The nature of the proposed abortion method and associated risks and alternatives that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

(3) The probable gestational age of the unborn child at the time the abortion is to be performed, and the probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed. If the unborn child is viable or has reached a gestational age of more than 19 weeks, that:

a. The unborn child may be able to survive outside the womb.

b. The woman has the right to request the physician to use the method of abortion that is most likely to preserve the life of the unborn child, provided such abortion is not otherwise prohibited by law.

c. If the unborn child is born alive, the attending physician has the legal obligation to take all reasonable steps necessary to maintain the life and health of the child.

(4) The physician who is to perform the abortion or the referring physician is required to perform an ultrasound on the unborn child before the abortion. The woman has a right to view the ultrasound before an abortion. The woman shall complete a required form to acknowledge that she either saw the ultrasound image of her unborn child or that she was offered the opportunity and rejected it.

(5) She has the right to view the videotape and ultrasound of her unborn child as described in Section 6.

(6) Any need for anti-Rh immune globulin therapy, and if she is Rh negative, the likely consequences of refusing such therapy and the cost of the therapy.

(7) She cannot be forced or required by anyone to have an abortion. She is free to withhold or withdraw her consent for an abortion without affecting her right to future care or treatment and without the loss of any state or federally funded benefits to which she might otherwise be entitled.

(c) The woman shall complete and sign a form that she has received the information of subsections (a) and (b), and does provide her informed consent for an abortion on her unborn child.

(d) Prior to the performance of an abortion, the physician who is to perform the abortion or his or her agent shall receive the signed receipt of the certified mail dated 24 hours before the abortion, if mailed, and the signed forms that she has received the information of subsections (a) and (b) before the abortion, had the oppor-

tunity to view the video and the ultrasound of her unborn child, and provided her informed consent for an abortion. The abortion facility shall retain the signed receipt, signed forms, and the ultrasound in the woman's medical file for the time required by law, but not less than four years.

Section 5. (a) The Department of Public Health shall publish within 180 days after the effective date of this act, and shall update on an annual basis, the following easily comprehensible printed materials:

(1) Geographically indexed printed materials designed to inform the woman of public and private agencies and services available to provide medical and financial assistance to a woman through pregnancy, prenatal care, upon childbirth, and while her child is dependent. The materials shall include a comprehensive list of the agencies, a description of the services offered, and the telephone numbers and addresses of the agencies.

(2) The printed materials shall include a list of adoption agencies geographically indexed and that the law permits adoptive parents to pay the cost of prenatal care, childbirth and neonatal care.

(3) Printed materials that inform the pregnant woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term. It shall include color photographs of the developing child at each of the two-week gestational increments, a clear description of the unborn child's development, any relevant information on the possibility of the unborn child's survival, and dimensions of the unborn child. The materials shall be realistic, clear, objective, non-judgmental, and designed to convey only accurate sci-

entific information about the unborn child at the various gestational ages.

(4) The materials shall contain objective information describing the methods of abortion procedures commonly employed and the medical risks of each, and the medical risks associated with carrying a child to term.

(5) The printed materials shall list the support obligations of the father of a child who is born alive.

(6) The printed materials shall state that it is unlawful for any individual to coerce a woman to undergo an abortion, that any physician who performs an abortion upon a woman without her informed consent may be liable to her for damages in a civil action at law.

(7) The material shall include the following statement: "There are many public and private agencies willing and able to help you to carry your child to term, and to assist you and your child after your child is born, whether you choose to keep your child or place him or her for adoption. The State of Alabama strongly urges you to contact those agencies before making a final decision about abortion. The law requires that your physician or his or her agent give you the opportunity to call agencies like these before you undergo an abortion."

(b) The materials in subsection (a) shall be in a bound booklet, shall contain large clear photographs, and shall be printed in a typeface large enough to be clearly legible.

(c) The materials required under this section and the videotape described in Section 6 shall be available to the general public, from the Department of Public Health upon request, and appropriate number to any person, facility, or hospital. The department may charge a reasonable

fee based on the cost of producing the materials and videotape.

Section 6. (a) All facilities where abortions are performed and all facilities of physicians who refer for abortion shall have video viewing equipment. The video that may be shown to those who want to see it shall be identified by title, updated from time to time by the Department of Public Health, and shall be objective, nonjudgmental, and designed to convey accurate scientific and medical information, and shall contain at a minimum, the information required in subsections (3), (4), (5), (6), and (7) of Section 5.

(b) All facilities where abortions are performed and all facilities of physicians who refer for abortion shall have ultrasound equipment. An ultrasound shall be performed on each unborn child before an abortion is performed.

(c) The Department of Public Health shall develop a signature form for verifying that she has received the complete information as described in Section 4, was offered the opportunity of viewing the video and ultrasound image of her unborn child, and provides her informed consent for an abortion on her unborn child.

(d) Facilities as used in this section shall not include hospitals that do not regularly or routinely perform abortions or are otherwise not defined by any statute or regulation as an abortion or reproductive health center. This shall not, however, relieve any facility or physician to whom this section is applicable from the obligations stated herein.

Section 7. Only a physician may perform an abortion.

Section 8. (a) Where a medical emergency compels the performance of an abortion, the physician shall inform the woman, before the abortion if possible, of the medical indications supporting his or her judgment that an abortion is necessary to avert her death or to avert substantial and irreversible impairment of a major bodily function.

(b) The Department of Public Health shall develop a signature form for recording the medical conditions associated with a medical emergency abortion. A signed copy of the abortion, and the original copy retained in the woman's medical file for the time required by law, but not less than four years.

Section 9. (a) Any person who intentionally, knowingly, or recklessly violates this act is guilty on a first offense of a Class B misdemeanor, on a second offense of a Class A misdemeanor, and on a third or subsequent offense of a Class C felony.

(b) After two convictions within a 12–month period of any person or persons at a specific abortion or reproductive health center, the license of such center shall be suspended for a period of 24 months and may be reinstated after that time only on conditions as the Department of Public Health requires to assure compliance with this act.

Section 10. In addition to whatever remedies are available under the common or statutory law of this state, failure to comply with the requirements of this act shall:

(a) Provide a basis for a civil action for compensatory and punitive damages. Any conviction under this act shall be admissible in a civil suit as prima facie evidence of a failure to obtain an informed consent or parental or judicial consent. The civil action may be based on a claim that the act was a result of simple negligence, gross negligence, wantonness, willfulness, intention, or other legal standard of care.

(b) Provide a basis for professional disciplinary action under any applicable statu-

tory or regulatory procedure for the suspension or revocation of any license for physicians, psychologists, licensed social workers, licensed professional counselors, registered nurses, or other licensed or regulated persons. Any conviction of any person for any failure to comply with the requirements of this act shall result in the automatic suspension of his or her license for a period of at least one year and shall be reinstated after that time only on such conditions as the appropriate regulatory or licensing body shall require to insure compliance with this act.

(c) Provide a basis for recovery for the woman for the wrongful death of the child, whether or not the unborn child was viable at the time the abortion was performed or was born alive.

Section 11. In every civil or criminal proceeding or action brought under this act, the court shall rule whether the anonymity of any woman upon whom an abortion has been performed or attempted, shall be preserved from public disclosure if she does not give her consent to such disclosure. The court, upon motion or sua sponte, shall issue written orders to the parties, witnesses, and counsel and shall direct the sealing of the record and exclusion of individuals from courtrooms or hearing rooms to the extent necessary to safeguard her identity from public disclosure. In the absence of written consent of the woman upon whom an abortion has been performed or attempted, anyone, other than a public official, who brings an action under Section 11 shall do so under a pseudonym. This section may not be construed to conceal the identity of the plaintiff or of witnesses from the defendant.

Section 12. Nothing in this act shall be construed as creating or recognizing a right to abortion. It is not the intention of this act to make lawful an abortion that is currently unlawful nor to deny a woman an abortion that is lawful. Following abortion counseling, the withdrawal of consent to an abortion must be followed with appropriate referrals to ensure adequate care for a child that is to be delivered.

Section 13. Although this bill would have as its purpose or effect the requirement of a new or increased expenditure of local funds, the bill is excluded from further requirements and application under Amendment 621 because the bill defines a new crime or amends the definition of an existing crime.

Section 14. If any one or more provision, section, subsection, sentence, clause, phrase, or word of this act or the application thereof to any person or circumstance is found to be invalid or unconstitutional, the same is hereby declared to be severable and the balance of this act shall remain effective. The Legislature hereby declares that it would have passed this act, and each provision, section, subsection, sentence, clause, phrase or word thereof, irrespective of the fact that any one or more provision, section, subsection, sentence, clause, phrase, or word be declared invalid or unconstitutional.

Section 15. This act shall become effective 180 days after its passage and approval by the Governor, or upon its otherwise becoming a law.

### ORDER AND PRELIMINARY INJUNCTION

In accordance with the Memorandum Opinion entered this date, it is hereby ORDERED as follows:

1. The Motion for Temporary Restraining Order is DENIED.

2. The Motion for Preliminary Injunction is GRANTED only to the following extent:

The Defendants and their agents are hereby PRELIMINARILY ENJOINED FROM:

a. Enforcing Act. No.2002–419 by defining the term "Medical Emergency" as used in the Act in any way that does not include the following understanding to be included in the definition:

[W]hen a reasonable physician would determine that some specific information required to be given under Act No. 2002–419's informed consent provisions would cause a woman psychological harm sufficient to rise to the level of a medical emergency, the physician may forgo providing this specific information to the woman. This conclusion does not, however, exempt the physician from otherwise complying with Act. No.2002–419's informed consent requirements or the twenty-four hour waiting period. The physician still must provide the woman with all other required information that does not create a significant, non-temporary threat of severe harm to the woman's mental health, even if this information makes the woman extremely uncomfortable or creates a substantial degree of anxiety.

b. Enforcing the following provision in Section 4(b)(3) of Act No. 2002–419:

"or has reached a gestational age of more than 19 weeks, that:

a. The unborn child may be able to survive outside the womb."

in any way that would prevent the person giving the information under the requirements of that section from advising the woman fully and in good faith of his or her understanding of the terms, of the nature of any such survival, that this is merely a possibility, and that the survival will or may be of extremely limited duration.

c. Distributing the materials set out in Section 5 and the video referred to in Section 6 of Act No. 2002–419, and enforcing the Act in any way that would require the reference to, or the delivery or showing of such materials or video by anyone.

d. Enforcing Section 4(a) of Act No. 2002–419 except as follows:

Section 4. Except in the case of a medical emergency, no abortion shall be performed or induced without the voluntary and informed consent of the woman upon whom the abortion is to be performed or induced. Except in the case of a medical emergency, consent to an abortion is voluntary and informed if and only if:

(a) At least 24 hours before the abortion, the physician who is to perform the abortion, the referring physician, or a qualified person has informed ... the woman in person ... of ... agencies that offer assistance, adoption agencies, development of the unborn child, methods and risks of abortion and childbirth, father's obligations, and alternatives to abortion.

e. Enforcing Act No. 2002–419 in cases of women whose fetuses have been diagnosed with lethal fetal anomalies.

f. Enforcing that Act to apply to ectopic pregnancies.

g. Enforcing any regulations which conflict with this Order.

3. Plaintiffs are given until October 22, 2002 to file any objections they may have to any specific part of any of the materials or video prepared by the Alabama Department of Public Health under the provisions of the Act. As to any objection, the Plaintiffs shall state in detail why the provision to which the objection is directed is either untrue or misleading and shall cite by page and line number the parts of any document

which they submit in support of the objection.

Defendants are given until November 12, 2002 to respond, in similar form.

4. The Motion for Preliminary Injunction is DENIED in all other respects.

5. This Preliminary Injunction shall become effective upon the giving of security by the Plaintiffs, pursuant to *Fed. R.Civ.P.* 65(c), in the amount of $10,000, and in form to be approved by the clerk of court, and shall remain in effect until further order of the court.

### AMENDMENT TO ORDER AND PRELIMINARY INJUNCTION

For good cause shown, it is hereby ORDERED that the Order and Preliminary Injunction (Doc. # 19) entered by the court on September 30, 2002, is AMENDED as follows:

1. Paragraph 2d is AMENDED to read as follows:

d. Enforcing Section 4(a) of Act No. 2002–419 except as follows:

Section 4. Except in the case of a medical emergency, no abortion shall be performed or induced without the voluntary and informed consent of the woman upon whom the abortion is to be performed or induced. Except in the case of a medical emergency, consent to an abortion is voluntary and informed if and only if:

(a) At least 24 hours before the abortion, the physician who is to perform the abortion, the referring physician, or a qualified person has informed ... the woman in person, or by return receipt certified mail restricted delivery, and if by mail, again in person prior to the abortion ... of ... agencies that offer assistance, adoption agencies, development of the unborn child, methods, and risks of abortion and childbirth, father's obligations, and alternatives to abortion. Mailing ... may be arranged by telephone.

2. The following paragraph is ADDED:

6. The Plaintiffs are not required to use the consent forms prepared by the State pending final determination of this matter, but shall use such consent forms as they deem appropriate, in the good faith exercise of professional judgment, to document that they have complied fully with the Woman's Right to Know Act in accordance with this Order.